FILED

May 24 2022

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/ shellyy        DEPUTY

1  HUNG DUONG NGUON
2  K-49649, C-13-238
   #80 Alta Road
3  San Diego, CA 92179

4  In Pro Se

5

6                   UNITED STATES DISTRICT COURT
7                   SOUTHERN DISTRICT OF CALIFORNIA

8

9  HUNG DUONG NGUON,                    Case No.: 21cv2113-CAB (JLB)
                        Plaintiff,
10                                       Second Amended Complaint; Demand for Trial
11           vs.                         pursuant to Fed. R. Civ. P. 16 and Jury demand
                                         under Rule 38(b), Fed. R. Civ. P.; and Request
12  MARY ANN GLYNN, et al.,              for emergency Preliminary Injunction; Memoran-
                        Defendants.      dum of Points and Authorities in Support of JMc
13

14  A. Preliminary Statement

15       1.      Plaintiff Hung Duong Nguon, a state prisoner confined at the Richard J.
16  Donovan Correctional Facility ("RJD") in San Diego, California, proceeding pro se, has paid the
17  civil filing fee and file this Second Amended Complaint pursuant to 42 U.S.C. § 1983.
18  Plaintiff claims he received inadequate medical treatment in violation of the Eighth and
19  Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and state law.

20  B. Jurisdiction

21       2.      Jurisdiction is invoked pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 1343(a)(3),
22  2671, 2680, 2674, 2675(a), 2679(b)(2)(A), 1331, 1367, 1391(b), 1343, 1346(b), 1402(b); USCS Const. Amend.
23  8 standard 584; USCS Const. Amend. 14; Cal. Const. Art. 1 § 17; 18 USCS § 242; Cal. Gov Code
24  §§ 845.6; Cal. Bus & Prof Code § 2290; Cal Code Civ Proc §§ 427.10(b), 428.10, 428.30, 427.10;
25  3045.1; 42 USCS §§ 12101, 233(a), 1985; 10 USCS § 855; Fed. R. Civ. P. 9(b); 28 U.S.C. § 2284;
26  CCP § 335.1; and 15 CCR § 3271.

27  C. Plaintiff's Factual Allegations

28       3.      Plaintiff went to the "MD-line" on December 27, 2019, where Defendant RJD

1

1  Dr. Erica Janna Goyal CORLEONE examined him and "lied and fabricated on CDCR documents"
2  that Plaintiff did not have a compression fracture of his spine and lumbar spine scoliosis, even
3  though "a handful of medical doctors" had previously diagnosed those conditions. He alleges his severe
4  chronic back pain was left untreated by Dr. Corleone causing his condition to worsen to the point
5  where his back goes out causing him to "fall hard to the ground," and has debilitating pain when he
6  walks, stands, sits or bends, as well as numbness, tingling and weakness in his back and legs, and
7  loss of control of his bladder and bowels. (Compare Ex. 1 with Ex. 2)

8          4.      On January 6, 2020, Plaintiff went to the MD-Line again and was seen by
9  Defendant RJD Dr. John Kwok-Wah CHAU who "upheld" the "fabrication of CDCR documents in
10  conjunction with" Dr. Corleone. Plaintiff states that although he has "pain that's radiculopathy,"
11  Dr. Chau "lied and fabricated on CDCR documents" that he has "chronic back pain without
12  radiculopathy," and based on that diagnosis denied his requests for morphine, a CT-Scan and
13  an MRI. (See Ex. 3) Dr. Chau also deleted spinal scoliosis from the "problem list" of Plaintiff's
14  ongoing medical conditions and falsely claimed he did not show acute distress or grimacing.
15  Plaintiff states that doctors specializing in spine problems at the University of California,
16  Davis have diagnosed him with "chronic-appearing vertebral body height loss," "multilevel disk
17  degeneration within the thoracic spine," "hypodense foci with multiple vertebral bodies [with]
18  coarsened trabeculae, possibly representing osseous hemangiomas," "facet arthropathy," "disc
19  bulge with intervertebral disc height loss," "bilateral facet arthropathy with small left facet
20  joint effusion," and "focal protrusion with small annular fissure into the right lateral recess."
21  (See Ex. 4) Several other doctors have diagnosed him with "lumbar spinal scoliosis" with "gross thoracic
22  kyphosis," "spasm in thoracolumbar para spinals," and "chronic severe back pain from the thoracic
23  vertebrae down to the lumbar vertebrae that at times the severe pain shoots all the way down
24  his legs to the bottom of his feet," whereupon, confirmed of neurological positive for weakness.
25  After he saw Dr. Chau again on January 14, 2020, Dr. Chau falsified medical records to reflect that
26  Plaintiff did not complain of a "decubitus ulcer in the buttocks or sacrum area [and] pressure
27  sores," and then "denied every request that Plaintiff asked for." Plaintiff filed 602 grievances against
28  Dr. Corleone on January 9, 2020, and against Dr. Chau on January 23, 2020.

1    5.    On March 2, 2020, Plaintiff went to the MD-line and was seen by Defendant
2 RJD Gina CASIAN who, "following in the footsteps of defendants Corleone and Chau in lying and
3 fabricating on CDCR documents," found "the gross alignment of the spine is within normal limits," and
4 refused "to believe plaintiff has serious back problems that caused him to fall multiple times."
5 (See EX. 5)

6    6.    Plaintiff have been interviewed by Defendant RJD Armyn Ferrer-SAZON
7 numerous times on dozens of various 602 grievances he filed against defendant medical doctors (Luu, Chau,
8 Corleone, Silva, Mohamed, Casian, Santos, Guldseth, Pashy Sedighi, Clayton, Roberts, Hodges and Barenchi) regarding his
9 grievance related to the actions of the doctors listed above. Nurse practitioner Sazon failed to
10 recognize that Plaintiff had a serious medical need and she had the responsibility to intervene so
11 Plaintiff could "see a different doctor" and obtain an "effective cause of treatment." Sazon was aware
12 that Chau, Corleone, Luu, Casian, Guldseth, Barenchi and Hodges had "discontinued" Plaintiff's pain medication
13 for no medical reason. "I'm only a nurse," Sazon told Plaintiff. "I can't tell these doctors what to do,
14 and I'm not going to lose my job on behalf of you [Plaintiff] by saying these doctors are wrong
15 or re part on them." Wherefore, Sazon "aided and abetted" that deliberate indifference to his
16 serious medical needs by rejecting his 602 grievances against Drs. Corleone, Chau, and Luu. He
17 filed a 602 grievance against nurse Sazon for [rejecting] to process his 602 grievances against
18 the doctors, which she rejected to process it as well.

19    7.    On December 31, 2019, Plaintiff filed a "Reasonable Accommodation Request
20 CDCR 1824" in which he identified what "he is unable to do because of the serious back
21 problem that he has," and in which he requested steroid injections to his lumbar spine, an egg-
22 crate mattress, a "no full duty chrono," a high medical risk classification, a morphine prescription,
23 and referral to an orthopedist. Plaintiff is an individual with a disability, which Defendant CDCR
24 is liable under the ADA due to the facts CDCR intentionally failed to provide meaningful access
25 and reasonable accommodation to Plaintiff who is disabled. Plaintiff is qualified to receive the
26 benefit of CDCR's services to the simple accommodation he listed above. Defendant CDCR violated
27 Plaintiff's ADA rights by excluding him to participate in these programs and denying him CDCR's
28 services that is owed to him. Therefore, such exclusion, denial of benefits, or discrimination

1   was by reason of [his] disability.

2   8.   On January 28, 2020, Defendant Dr. C. SCHULTZ, an RJD radiologist,

3   engaged in fraud" by redacting the report of Plaintiff's x-ray, falsely stating that Plaintiff's

4   spine is "within normal limits," and diagnosing his condition as "mild degenerative spondylosis," which

5   Plaintiff states is similar to arthritis, thereby aiding and abetting the deliberate indifference of

6   the medical doctors, (See Ex. 6; Compare with Exs. 2 and 4) He claims that because the

7   diagnoses of his "sixteen different back problems are changed to a simple matter of spondylosis or

8   arthritis," his requests for a back brace, morphine, referral to an orthopedic specialist or surgeon, a

9   full spine MRI, a full spine CT-scan, and physical therapy were all denied. A "handful of

10   defendant" medical doctors and registered nurses told him: "All you have is arthritis. We do not

11   provide 'back brace' or morphine for people with arthritis." Plaintiff have tried numerous

12   pain medications and creams, none of which are effective to alleviate his pain other than morphine

13   or fentanyl. And although doctors at the University of California, Davis recommended Gabapentin, he

14   was deliberately denied that medication by Defendant medical doctors in violation of California

15   Prison Health Care Services Pain Management Guidelines.

16   9.   Plaintiff submitted a multitude of CDCR 7362 forms "Health Care Services

17   Request Form" addressed each and individually to Defendant medical doctors: (1) Gail MESSLER, (2) David

18   CLAYTON, (3) David GULDSETH, (4) Amir MOHAMED, (5) John HODGES, (6) Steven ROBERTS, (7) Ryan

19   BARENCHT, (8) Michal Balbin SANTOS, and (9) Tri Thanh LUU— Plaintiff complaining about his severe chronic

20   back pain, his back giving out causing him to fall countless times where he end up getting one injury

21   after another. Defendants are well informed of Plaintiff debilitating health condition, yet they elect

22   to let Plaintiff to suffered in severe pain with no treatment and consciously allowing his weaken

23   back to give out again and again, resulting in one serious injury after another.

24   10.   On April 3, 2020, Plaintiff submitted a CDCR 7362 complaining that his

25   back gave out and he fell hard to the concrete ground causing a serious injury to his left

26   hand and left wrist. On April 15, 2020, Plaintiff went to the MD-line and saw Dr. Luu who

27   purposefully harm Plaintiff by [wrongly] diagnosing his left hand wrist injury as a "muscle

28   sprain/strain" in order to denied a chosen course of medical treatment, since it's a fact Dr. Luu

1  tells Plaintiff: "It's just a sprain, it'll go away by itself within 3-week." (See Ex. 8) It is
2  medically unacceptable under the circumstances for Dr. Luu to choose a course of treatment that is
3  no difference from [no treatment] at all in conscious disregard of an excessive risk to Plaintiff's
4  health. Dr. Luu even sent a short letter to Plaintiff about the x-ray on Plaintiff's left wrist that
5  is [normal] and "no provider follow-up is required"—is one and the same as above statement
6  of Dr. Luu telling Plaintiff that the wrist injury will go away by itself within 3-week. It
7  didn't go away by itself, as of today Plaintiff still have the same injury to his left wrist years
8  later.

9        11.      On April 17,2020, Defendant RJD radiologist Dr. M. LAUFIK, "in order
10  to aid and abet defendant Dr. Luu['s] extreme departure from standard of practice so that he
11  can harm Plaintiff by denying treatment altogether," "illegally engaged in fraud" when he "heavily
12  redacted" a report of an x-ray of Plaintiff's wrist. (See Ex. 10) Countless times Plaintiff asked
13  Drs. Luu, Santos, Corlene, Silva, Mohamed, Euldseth, Pasha, Baranchi, Clayton, Hodges, Sediphi and Roberts for an ice
14  pack so he can put on his swollen left wrist to treat the inflammation of two tendons that control
15  movement of Plaintiff's left thumb and their tendon sheath. For 6-month Defendant medical doctors
16  denied Plaintiff a simple course of conservative treatment by blatantly refusing to provide him an
17  ice pack that's recommended by CDCR itself "Patient education materials." (See Ex. 11) Dr. Luu on
18  9-8-2020 explained to Plaintiff that an ice pale [sic] and orthopedics (hand surgeon) are not
19  [indicated] at this time. Each and every Defendant medical doctors uses those key words [not
20  indicated] to denied medical treatment altogether— consciously disregarding an excessive risk to
21  Plaintiff's health overall. Plaintiff 602 grievance eventually got him an MRI for his left wrist
22  done on 8/18/2020, whereupon, Defendant RJD radiologist Dr. R. WATERS follow suit with Dr.
23  Laufik. (See Ex. 10) And Defendant RJD radiologist B. Brown did the same.

24        12.      Every times Plaintiff goes to the MD-Line and see all these Defendant
25  medical doctors, on average he's in the doctor's office for about 15 to 30 minutes, and on a few
26  occasions it lasted for over an hour. Plaintiff is very garrulous when he sees each and every-
27  one of the Defendant medical doctors individually, to the point these doctors tells him to stop
28  talking so they can talk. On 12-27-2019, Plaintiff told Dr. Corlene, "I'm in severe pain. I need

1 something stronger than Tramadol — like Morphine". Dr. Corleone squinted her eyes and

2 tells me derisively, "You're lucky you are on Tramadol, because if you where my patient I would

3 give you nothing." Flabbergasted Plaintiff interjected, "I've been prescribed Tramadol painkiller for

4 years for compression fracture of my spine; my back is collapsing upon itself where I've lost

5 about two inches in height already. My lumbar spine scoliosis is causing pain too. Over the

6 years The Tramadol is not effective anymore to relieve my severe chronic back pain, which

7 sometimes it causes my back to give out and I fall hard to the ground injuring myself

8 again and again." She shook her head from left to right, "We have no record of you even

9 having compression fracture of the spine or scoliosis." Immediately Plaintiff handed her medical

10 documents from exhibit 2 and asked her to look at U.C. Davis examination on 5-12-2018." She

11 took a quick look at Plaintiffs documents, and refuses to go on her computer to check the

12 U.C. Davis findings. "Our record only show you have arthritis to your lower back," Dr.

13 Corleone clearly stated, "for you to have severe pain and falling is not symptoms of arthritis."

14 Plaintiff could not believe what he was hearing, and said, "I'm going to file a 602 against

15 you and sue you in court. It's illegal for you to purposefully let me suffer in severe pain

16 day after day. I can end up breaking my back or neck one day when my weaken back

17 keeps on giving out because you you denying me treatment altogether." She rolled her eyes

18 and said with a smirk, "Go ahead and 602 and sue me. I don't care."

19         13.      On 1-6-2020, Plaintiff told Dr. Chau: "I'm in severe pain. I need a

20 prescription of Morphine." He basically cut me off by holding up his right hand in an open

21 gesture of "stop talking". Most likely he was reading Dr. Corleone report of 12-27-2019, and

22 when he was done he said, "I'm discontinuing your Tramadol, and it's not indicated for you to

23 be on Morphine because all you have is just arthritis." He then asked me to stand up so he can

24 examine my back. I did. During the examination and all the things he told me to do, he was

25 asking one question after another "Is your pain located only at your lower back." Plaintiff

26 answered, "No. My severe back pain spread all-over: from the middle of my back down to the

27 bottom of my back. Sometimes I am getting spasms that travel throughout my whole back,

28 as the sharp stabbing pain shoots down to my legs, all the way down to the bottom of

1 my feet. The severe pain also radiate around my waist. Sometimes the pain is so bad
2 it causes my back to give out and I fall hard to the ground." Plaintiff was not able to bend
3 his back all the way down as Dr. Chau wanted him to, standing on his tippy-toe(tiptoe) from the
4 balls of his feet and toes was very difficult, walking on tiptoe was extremely painful, and the
5 leg raise on the examination table was hard. "You can get Ibuprofen OTC in the canteen.
6 I will order you Acetaminophen and Capsaicin cream." When Plaintiff was back on his seat
7 sitting on the chair, he handed medical documents from exhibit 2 and asked Dr. Chau to take
8 a look at U.C. Davis hospital full findings of 5-12-2018. "I have a lot of back problems
9 Dr. Chau — sixteen different back problems that causes severe chronic pain all day and night.
10 I have been on Ibuprofen and Acetaminophen years ago in or around 2007 or 2008 and it does
11 not work. I tried out the Capsaicin cream in 2019 and it didn't help relief my severe
12 chronic back pain at all." After reading Plaintiff's documents and looking on the x-ray of
13 4/4/2018 Dr. Chau tersely said, "You are getting older — it's just arthritis. It's normal. We have
14 no finding of you having compression fracture or scoliosis or anything else. Just lumbar
15 spondylosis." Plaintiff is half-Chinese and half-Vietnamese, and Dr. Chau is Chinese and he
16 could not believe Dr. Chau would do this to him, as he pleaded, "Please, I need a prescription
17 of Morphine to relief my severe chronic back pain. I need physical Therapy twice
18 every week for years. I need to see a specialist and a full spine CT and MRI of my
19 back to see of its severity." Almost close to tears Plaintiff begged, "Please don't do this to
20 me and let me an up as a paraplegic one day because my back gave out and I fall and
21 injure my neck and spine." Loudly, and almost to the level of yelling, Dr. Chau spoke, "That's
22 not my problem. Stop standing up than if you're afraid of falling down! We're done!" And
23 he called for the correctional officer to take me out.

24          On 3-2-2020, Dr. Casian told Plaintiff, "I'm not your new doctor. I'm
25 just filling in for Dr. Chau who's your PCP." This is an acronym for "primary care provider/
26 physician". Every Defendant medical doctors that Plaintiff see in person he complained of severe
27 chronic back pain and of his weaken back giving out causing him to fall multiple times,
28 "I'm in severe pain. The current pain medications is not working." Plaintiff explained to Dr. Casian

1  "Please could you write me a prescription of Morphine to relief my severe chronic back
2  pain," Plaintiff asked Dr. Casian politely. "I'm looking at your files and everything is normal," Dr. Casian
3  pointed out to Plaintiff. "Dr. Goyal and Dr. Chau earlier saw you, which they already have com-
4  municated with you that your back is normal for your age. Pain is not indicated when your back
5  is normal," which she then looked at me as if I'm some kinds of an idiot. (e.g. "Dr. Goyal" is
6  the named used at that time, and Dr. Corleone name came along a year later. Both Dr. Goyal and
7  Dr. Corleone are one and the same person) Quite perturbed Plaintiff could not believe these
8  medical doctors at RJD would resolutely participate in changing the facts of Plaintiff's diagnosis
9  and medical problems to the point that it's no difference from "no course of treatment at all."
10  Again Plaintiff brought out his medical documents from exhibit 2 and asked her to take a
11  look on the computer of my medical file dated 3-12-2018 from U.C. Davis hospital detailed
12  evaluations. She took Plaintiff's medical documents and read it cursorily. "As you can see Dr.
13  Arya confirmed with U.C. Davis I have multilevel compression fractures. And Dr. Soltanian confirmed
14  I have lumbar spine scoliosis," Plaintiff mentioned to her. "I have sixteen different back problems
15  and it's only getting worse without treatments. That in itself is not normal. Every times my
16  back gives out and I fall hard against the concrete floor, I get injured again and again and again.
17  I could even die if I break my neck." It's as if the confirmations from Plaintiff's medical documents
18  and the existing evidence of 5-12-2018 U.C. Davis is not enough to bring her to light that
19  "adequate medical care" is owed to Plaintiff from her as a medical doctor and CDCR, when she
20  uttered, "Like I said, your back is normal. There's no indication for you to be in pain or be put
21  on Morphine. I don't believe your "normal back" is causing you to fall so many times.
22  Now if you're concern of breaking your neck and dying, that's completely different from the
23  issue of your back; so I recommend you put in a "Sick Call Slip" [Sic] for it and see your
24  doctor about it." A "Sick Call Slip" is a "Health Care Services Request Form" CDCR 7362.
25  (See Ex. 12)

26       15.   On 4-15-2020 when Plaintiff asked Dr. Luu for an ice pack given to
27  him four times a day for thirty days so he could put it on his swollen left wrist and relief
28  the inflammation as a first step of conservative treatment. Dr. Luu tells Plaintiff, "You

1 don't need any ice packs. I told you it's just a sprain, it'll go away by itself. Beside,
2 an ice pack is not medically indicated for your condition." In frustration Plaintiff had no other
3 choice, and told Dr. Luu, "I'm going to file a 602 on you about this, and sue you in court for
4 denying me ice packs that I know I need to treat the swelling and inflammation." Nonchalantly he
5 lean back with his head held high looking down at me as if I was a pestering insect, before he
6 spitted out broken English in outraged and disgust, "Yuu go right head! Yuu go right head
7 and file 602 again me! No one here will waste money givin' yuu ice pak. Yuu
8 want ice pak! Yuu yo to the kitching and yet it yurself. Don't yuu waste my
9 time asking me for ice pak anymore — yuu hear!" Dr. Luu is Vietnamese, from the same
10 country of Vietnam that we both speak Vietnamese fluently, yet it's overwhelmingly
11 astonishing he denied me ice packs that he can easily order. Plaintiff have no access getting ice
12 from the kitchen.

13      16.     Plaintiff went to the MD-line on May 1st, 2020, where Defendant RJD
14 Dr. Michael Balbin SANTOS examined him for his left wrist severe pain and his multiple severe
15 chronic back problems. "The course of medical treatment for my back is not working," Plaintiff
16 complained to Dr. Santos. "My back is in severe pain and it keeps on giving out causing me
17 to fall and injuring myself." Plaintiff extended his left hand and pointed at the left wrist
18 swelling and inflammation as he continued to elucidate to Dr. Santos, "This injury right here is
19 the result from my back giving out and I fall, my body landing full force on my left hand as
20 my chest had devastating impact on it." Dr. Santos walked over and gently took my left hand in
21 his, lightly touching the inflammation, then asking Plaintiff to moved his left hand form left to
22 right, then up and down, and then moving the fingers and thumb, "It's not that bad," Dr.
23 Santos remarked. Plaintiff want back to address his back problems, "I've been asking for a
24 prescription of Morphine to relief the daily severe pain I'm suffering. I've also asked
25 for a steroid injection once a month for three months to be injected into my lumbar
26 spine, a referral to an orthopedist, an egg-crate mattress, a referral to see a pain specialist,
27 physical therapy twice a week for years, a "no full duty chrono," and a high medical risk classifi-
28 cation — all of them have been denied. Please take a look at these medical documents I

1  have for you," Plaintiff handed medical documents from exhibit 2 to Dr. Santos, and asked him to
2  take a look on the computer of U.C. Davis hospital extensive reports on 5-12-2018. Plaintiff saw
3  Dr. Santos raised an eyebrow when he looked at Plaintiff's medical documents and then raises his
4  eyebrows again when he looked at the information on the computer. "When I am given medications
5  that still leave me in severe pain, and I am not getting the simple course of treatments that I
6  asked for— my back is getting weaker and weaker, as my multiple back problems is getting
7  worse causing me to fall again and again, resulting in one injury to the next. Please could you
8  write an order for me to get Morphine and steroid injection. And please can I get an
9  egg-crate mattress, and a referral to see an orthopedist and a pain management specialist."
10  He cut me off before Plaintiff could finish, "Morphine is not indicated for your condition, and
11  neither is steroid injection," Dr. Santos said plainly as he shook his head in a "no" gesture.
12  "From our record you only have arthritis of the lower back. All the treatments you're asking me to
13  give you is not indicated for people with arthritis." Just like the other Defendant medical doctors,
14  Dr. Santos continued with a course of medical treatment for Plaintiff's back was "medically unaccept-
15  able under the circumstances" because it was not [working] at all, and chosen "in conscious
16  disregard of an excessive risk to Plaintiff's health", due to the fact Defendant medical doctors is
17  well informed that Plaintiff's back keeps on giving out and causing him to fall hard against
18  the concrete ground, resulting from one injury after another, "Please can I get ice packs
19  four times a day for thirty days for my swollen left wrist with its inflammation tendons that's getting
20  worse," Plaintiff asked Dr. Santos courteously. "I can't do that, Dr. Santos stated, "the Administration
21  only allowed ice packs be given to patients in the infirmary." Curious of the word "Administration"
22  which prompted Plaintiff to asked, "You mean the CEO Mary Ann Glynn instructed medical
23  doctors to give out ice packs only to patients in the infirmary?" Dr. Santos nodded his
24  head in a "yes" gesture. "So since I am not in the infirmary I can't get ice packs," Plaintiff
25  asked in disbelief as Dr. Santos nodded his head again in a "yes" gesture.

26  　　　17.　　On April 20, 2020, Plaintiff went to the MD-line and was seen by
27  Defendant RJD Dr. Tri Thanh LUU concerning of his back problems and left wrist injury. "My
28  back is in severe pain all day and night— it's disturbing my sleeps, it's disturbing my daily activities

1  and it's disturbing my overall health," Plaintiff grievanced to Dr. Luu. "Sometimes the pain is
2  so painful it feel as if the bone of my back is sticking out of my chest causing me to have
3  a difficult time to breathe. I can't stand up for long, nor sit for long. I can't walk long
4  distance. Please, this course of treatment you guys (meaning the Defendant medical doctors) have me
5  on for my back is not working at all. I don't want to end up dead or bound to a wheelchair for
6  the rest of my life because my back give out and I broke my neck when I fall". During the
7  whole time when Plaintiff was talking Dr. Luu was busy focusing on the computer in front of
8  him. "I reviewed your medical charts thoroughly and all you have is a simple case of arthritis
9  to your lower back. Everyone who get old have arthritis, including me. What do you want?"
10  Exhausted dealing with all these corrupted doctors, Plaintiff asked, "Please could I have a
11  prescription of Morphine 60mg four times a day for 360 days, a referral to an orthopedist
12  and pain management specialist, a steroid injection to my lumbar spine once a month for
13  three months; a "no full duty chrono", a high medical risk classification and an egg-crate
14  mattress." He stared at Plaintiff as if Plaintiff was an annoying little fuck pestering him
15  with things that Plaintiff can "never" get — even if Eplig's was flying. "None of what you
16  asked for is indicated for your condition of arthritis." Before Dr. Luu could finish talking,
17  Plaintiff held out his left hand and handed medical documents from exhibit 2 to Dr. Luu,
18  and also, politely asked him to go on his computer to the date of 5-12-2018 U.C. Davis
19  hospital reports on Plaintiff's multiple back problems. "As of right now, all you have is arthritis
20  to your lower back," Dr. Luu succinctly said after he summarily reviewed Plaintiff's medical
21  documents and U.C. Davis hospital 5-12-2018 reports. Plaintiff retorted at the speed of
22  lightning. "You're saying my scoliosis that has no cure in modern medicine just magically
23  disappear and went away by itself." Dr. Luu furrowed his brows, squinting those beady little
24  oriental eyes of his, nostril flaring in annoyance with lips so pinched ready to explode in a
25  cornucopia of vile vitriol— "You never had scoliosis. Never!" Dr. Luu declared. Not a
26  surprise Dr. Luu took this route like other Defendant medical doctors to denied the
27  existence of Plaintiff's sixteen different back problem that's chronic and severe to
28  a "simple case of arthritis to Plaintiff's lower back," as Dr. Luu stated, which in effect

11

1  denied an effective course of medical treatment altogether. Meekly Plaintiff asked,
2  "Why do you talk with me like this?" Slowly Dr. Luu walked to the door as he answered
3  back corrosively with no etiquette in sight, "You fuk yourself! Not me." He opened the door,
4  his signature that the MD-line has ended, and for Plaintiff to leave immediately. (See Ex. 13)
5  The "Ongoing Problem List" Dr. Luu with actual malice deleted Plaintiff's multiple back problems
6  that's chronic in order to denied adequate medical care.

7         18.        On August 26, 2020, Plaintiff went to the MD-line and was seen by
8  Defendant RJD nurse practitioner Susan PASHA was under the guidance and mentorship of
9  Defendant RJD Ryan BARENCHI, chief physician executive & surgeon. (See Ex. 14) "My left wrist is
10 in severe pain," Plaintiff divulged to nurse practitioner (NP) Pasha, "and every morning when I wake
11 up it seem as if I'm not getting any blood flow to my fingers because I can't even bend them.
12 From day one I've been asking for ice packs to relief the swelling and inflammation of my left
13 wrist and the doctors denied me," NP Pasha took a short few steps toward Plaintiff "Can I see
14 your wrist?" NP Pasha asked. Plaintiff lifted his left hand and demonstrated by moving his
15 left thumb up and down to show her the telltale sign of de Quervain tenosynovitis that was
16 finally diagnosed by Dr. Santos on 8-11-2020. "You can see the inflammation moving along the
17 tendon," Plaintiff pointed out to NP Pasha, "whereas, there is no inflammation moving along the
18 tendon on my right wrist". Plaintiff moved his right thumb in juxtaposition up and dumb to his
19 left thumb for NP Pasha to see the normal right versus the abnormal left. "Please can I have
20 a prescription of morphine to relief my severe pain that I am suffering all day and night," Plaintiff
21 pleaded with NP Pasha. "Not for your condition," NP Pasha said flatly, "even if I did order it my
22 supervisor wouldn't approve it." Plaintiff was quite concern of losing all function of his left hand,
23 so he asked again, "Can I receive corticosteroid injection to my left wrist then?" She walked back
24 to her computer and checked on the previous doctor's progress notes (most likely Dr. Santos 8-11-20)
25 "Not at this time. Perhaps after your physical therapy on your left wrist," NP Pasha added,
26 "if there's no progress your PCP could consider the corticosteroid injection." Plaintiff could not
27 believe what he was hearing, so he rebutted, "An effective course of medical treatment for de
28 Quervain tenosynovitis is corticosteroid injection within six months of the injury. The longer the

1  corticosteroid injection is delay, the less effective it becomes when I do get it. Waiting
2  for physical therapy could take months before it is perform, and going through it and if it failed
3  is another six to eight months wasted for nothing." She thought for a moment of what Plaintiff
4  explained to her which is correct. "I can't just order you a corticosteroid injection because
5  it breaches protocol that conservative treatment must be consider first before evasive procedure.
6  You never know, PT may resolve your wrist problem." She gave a little smiled, Plaintiff didn't smile
7  back, nor believed all the cacophony bullshit that was coming out of her mouth. "Conservative
8  treatment, huh," Plaintiff said testily. "Can I get an order for ice packs four times a day for
9  thirty days, then. This is part of conservative treatment." She was completely caught off guard
10  showing a lack of surprised to my request. "We," NP Pasha said in hesitation, "we don't provide
11  ice packs here at this institution. The administration doesn't allowed it." It was obvious she
12  didn't want to get fined by giving something so mundane in medical treatment as an "ice pack"
13  to which Plaintiff need and indicated for. "You mean the administration as in CEO Mary Ann
14  Glynn, chief medical executive Steven Roberts, chief physician executive & surgeon John Hodges, and your
15  immediate supervisor Dr. Barenchi," Plaintiff helped her out. Not a word came out of her mouth,
16  but the feared in her eyes tells it all— that the administration instituting a toxic environment
17  of [d]irecting medical doctors to practice deliberate indifference to Plaintiff's serious medical needs,
18  where he can't even get an ice pack to alleviate his swelling and inflammation on his left wrist.

19        14.      On January 11, 2021, Plaintiff went to the MD-line and was seen by
20  Defendant RTD Dr. Jason SILVA concerning the "Ongoing Problem List" from the medical doctor
21  computer file— mainly Dr. Lun who purposefully left out (1) "Chronic back pain-severe," (2) "De
22  Quervain's tenosynovitis," (3) "Allergic conjunctivitis," (4) "Floaters," (5) "Edema," (6) "BPH," (7) "Temporal
23  Mandibular Joint (TMJ)," (8) "Osteopenia," (9) "Lumbar degenerative disc disease," (10) "Myopia," (11) "Nummular
24  eczema," (12) "Sporyiotic dermatitis," (13) "Wrist and joint intercarpal arthritis (left hand)," (14) "Lumbar spine
25  scoliosis," (15) "Inguinal hernia," (16) "Testicular mass," (17) "Compression fracture of spine," (18) "Vitamin D
26  deficiency," (19) "Hypocalcemia," (20) "Gross Thoracic kyphosis," (21) "Spasm in thoracolumbar paraspinals," (22)
27  "chronic-appearing vertebral body height loss," (23) "multilevel disk degeneration within the Thoracic spine,"
28  (24) "Hypodense foci with multiple vertebral bodies [with] coarsened trabeculae, possibly representing

1   osseous hemangiomas," (25) "Facet arthropathy," (26) "Disc bulge with intervertebral disc height

2   loss," (27) "Bilateral facet arthropathy with small left facet joint effusion," (28) "Focal protrusion with

3   small annular fissure into the right lateral recess," (29) "Sciatica," (30) "Neurological positive for weakness

4   of the whole back." When we take a look at exhibit 13, we can see these thirty medical problems

5   listed above is omitted on purpose by Defendant medical doctors in order to denied an effective

6   course of medical treatments altogether. "It's not medically indicated" are key words to their MO

7   (modus operandi) to denied adequate medical care by making a pathetic excused — "you don't have these

8   medical problems to be asking for treatments because it's not medically indicated." On this day Plaintiff

9   talked to Dr. Silva for over an hour, perhaps even two hours. "On August 11, 2020 Dr. Santos diagnosed

10   I ~~have~~ de Quervain tenosynovitis, yet still till this day five months later it is not listed on the doctor's

11   'Ongoing Problem List,'" Plaintiff pointed out to Dr. Silva. "So when a medical problem I [have] thats

12   not listed on the doctor's 'Ongoing Problem List,' and I'm going to the sic-line and seeing a

13   medical doctor before me asking for medical treatments — the doctor(s) tells me: 'you are not

14   diagnosed of this medical problem and it's not on the Ongoing Problem List. I can't provide

15   you any treatments when it's not medically indicated.'" Dr. Silva was listening carefully to Plaintiff

16   clarification, and nodded his head in cognizance. Seeing this Plaintiff continue to explicate even more,

17   "When I have multiple back problems — sixteen different ones and it is not listed on the doctor's

18   'Ongoing Problem List' — I can't even get a simple back-brace to support my already weakened

19   back and alleviate the severe pain that I'm suffering all day and night. Numerous times

20   I've tried getting a back-brace from a handful of doctors; and they tells me: 'It's not

21   medically indicated, since you only have arthritis to your lower back; and the sad part about it

22   "arthritis to lower back" is not even listed." So one medical problem after another was checked and

23   reviewed by Dr. Silva, which he also took a looked at Plaintiff medical documents from exhibit

24   2, and checked on the computer of U.C. Davis hospital 5-12-2018 extensive reports on Plaintiff's

25   multiple back problems. "Not only do I need you to list all the medical problems I have on

26   the doctor's 'Ongoing Problem List,' but I need you to provide me the necessary medical treat-

27   ments as well because I've been denied treatments for so long that it's overdue and causing

28   me serious harm thats irreparable," Plaintiff insisted. "The course of medical treatment for

1 my multiple back problems is Not working. My back keeps on giving out causing me to fall
2 hard to the concrete ground again and again, where I'm getting one injury after another due to
3 the ongoing failured of providing me adequate medical care. Worst case scenario I can end
4 up dead if I break my neck from falling, or permanent injury of paralysis and can never walk again."
5 Dr. Silva looked at Plaintiff with concern of what he just heard, and Plaintiff continued to
6 addressed his medical issues, "Since I've been at this prison I have tried to asked one medical
7 doctor after another for Morphine medication to alleviate my severe chronic back pain, physical
8 therapy twice a week for years, to see an orthopedis and pain management specialist, an
9 egg-crate mattress, steroid injection to my spine, a "no full duty chrono," and a high medical
10 risk classification. You, as a doctor I am seeing right now have authority to provide me
11 these treatments. Please, could you do it for me and order these things I desperately
12 need." Of the thirty medical problems Plaintiff contended, Dr. Silva only added two back problems
13 to the 'Ongoing Problem List' — "chronic back pain" and "lumbar degenerative disc disease" — and a
14 few other medical problems. "The things you are asking for it is not medically indicated," Dr. Silva
15 told Plaintiff. "I can't give it to you." Plaintiff knew this was going to happen dealing with all the
16 medical doctors at RJD who continued to choose a course of medical treatment that is addressed
17 to them face-to-face that it's not working, yet they continued to do so in conscious dis-
18 regard of an excessive risk to my health and [life]. "an added "de Quervain's tenosynovitis"
19 to the 'Ongoing Problem List,' which that is the result when my back gave out and it's
20 becoming a permanent injury," Plaintiff brought it up to Dr. Silva. "Look at my left arm, see that
21 long scar — that is when my back gave out and I fall hard against the gurney in front of
22 three correctional officers and a registered nurse who even reported on CDC documents. The
23 gurney must have cut me somehow because i was bleeding profusely from a two and a half
24 inch gash. You see on my medical file of blacken toenails on my left foot. That wasn't from
25 fungus. It was from my back gave out and I fall hard against the concrete floor injuring
26 my left foot toes so bad that blood was bleeding underneath, blackening my toenails afterward.
27 I've injured my elbows, head, knees, etc. all due to my back giving out causing me to fall.
28 How many more times do you want me to get injure before you help me as you're suppose

1    to?" Dr. Silva again looked at Plaintiff with concerned, but his actions speak otherwise,

2    "I can't write any orders for you," Dr. Silva said regrettably, "the administration is very

3    strict here, and all that you asked for the administration will disapprove if I order them for

4    you." He shrugged his shoulders, "It's out of my hands," Dr. Silva said to Plaintiff.

5         20.       On October 25, 2021, Plaintiff went to MD-line and was seen by

6    Defendant RJD Dr. Fred SEDIGHI on the ongoing problems of his multiple back problems. RJD

7    is considered a "Medical Facility" by inmate and staff throughout California, but from what

8    Plaintiff have been through with the medical doctors, it is a complete opposite, since Medical Facility

9    provide adequate medical care to the inmate/patient. "I have multiple back problems that has been

10    diagnosed and confirmed by many doctors in the past at other prisons and U.C. Davis's hospital,"

11    Plaintiff began his persistent effort to received medical cure; this time to Dr. Sedighi. "You have

12    on record for years I've been getting Tramadol painkiller for compression fracture of my spine,

13    yet I come here to this prison every doctors I see on MD-line purposefully take away this

14    diagnosis and treatment and deliberately letting my back suffered tremendous severe pain to the

15    point it keeps on giving out, causing me to fall and injuring myself again and again." Plaintiff

16    handed medical documents he had from exhibit 2 to Dr. Sedighi so he can take a quick look,

17    and Plaintiff also asked Dr. Sedighi to log on his computer before him to the files of U.C.

18    Davis hospital 5-12-2018. "When my lumbar spine scoliosis is disregarded by one medical doctor

19    after another that I never had it, I can't get medical treatment for it at all then, which

20    exacerbate my scoliosis worser and worser. And all my other back problems as you see on

21    the computer from U.C. Davis hospital, noting in their findings that I have multilevel disk

22    degeneration within the thoracic spine, facet arthropathy, bilateral facet arthropathy with small

23    left facet joint effusion, chronic-appearing vertebral body height loss, and a few other problems

24    as you can see on the computer. Every doctors here refuses to accept U.C. Davis hospital

25    findings, which in turn denied me a course of effective treatment altogether — resulting in

26    further unnecessary injury one after another when my weakened back give out and I fall

27    again and again," Plaintiff told Dr. Sedighi in length. Dr. Sedighi conveyed to Plaintiff, "Some

28    of the medical problems you mentioned we don't provide medical care at this facility. And some

of the findings listed by U.C. Davis there's no treatment at all for it." Of course he knows the course of medical treatment they have me on is not working, otherwise, I would not be addressing with him or other Defendant medical doctors so relentlessly. "The course of medical treatment for my multiple back problems is not working" Plaintiff alerted Dr. Sedighi. "My back is in severe pain all day and night, and it keeps on giving out causing me to fall and end up getting one injury after another. I'm afraid I could end up dead if the fall break my neck or paralyzed me permanently," He did not examine Plaintiff's back, nor order for any testing like a myelogram or a CT-scan or MRI of Plaintiff's full spine like U.C. Davis hospital. "The only thing we have is arthritis to your lower back," Dr. Sedighi said calmly to Plaintiff, "and the course of medical treatment we have you on is appropriate. Sorry, I can't change anything."

      21.      On March 28, 2022, Plaintiff went to MD-line and was seen by Defendant RJD Dr. David GULDSETH concerning his ongoing back problems and de Quervain tenosynovitis. "The injury to my left wrist is still causing me severe pain," Plaintiff raised the issue to Dr. Guldseth. Plaintiff demonstrated by extending and bending his left thumb, where the inflammation is prominently visible to the naked eyes for Dr. Guldseth to see for himself. "Can you see the inflammation moving up and down my tendon?" Plaintiff asked Dr. Guldseth. "Yes, I can see it," Dr. Guldseth concurred. He then got up from his chair and walked toward Plaintiff. "You don't mind if I examine your hand, do you?" Dr. Guldseth said to Plaintiff softly. "No, not at all," Plaintiff replied. "When I do the Finkelstein's test it causes extreme pain to the point I can't fully extend my left fist downward at all." He smiled at the word "Finkelstein's", since most inmates don't have an extensive vocabulary, especially medical terminology. "I need an order for ice packs so I can put on the inflammation four times a day," Plaintiff requested from Dr. Guldseth. On 4-19-2022 Plaintiff went to MD-line again and saw Dr. Guldseth, which he asked for for ice packs again, which this time he eMail the surpervising nurse Anna Sanchez to come to his office and see if it available. Nurse Sanchez said, "We don't give out ice packs to anyone here. It's just our policy. Even if we did you've been having this for so long the ice pack wouldn't help." Going back to 3-28-2022, Plaintiff also complained about his severe chronic back problems to Dr. Guldseth, "I'm in severe pain all day and night. My back is not getting any better,

17

1  but getting worse by the day. Please can I get a prescription of Morphine to relief my severe
2  pain?" As Plaintiff was talking Dr. Guldseth was reviewing Plaintiff's medical files. "We only give
3  Morphine to patients who have cancer." Dr. Guldseth straight-face lied, since there's a handful of
4  inmates at RJD that have a prescription of Morphine and they don't have cancer. "The course
5  of medical treatment you guys have me on is not working." Plaintiff informed Dr. Guldseth. "My back
6  keeps on giving out and I'm getting one injury after another when I fall hard against the
7  concrete floor. I broke my teeth from a fall on one incident, another fall broke my eyeglasses,
8  another one my wrist ending up de Quervain tenosynovitis, another one caused a two and a half inches
9  gash on my forearm. I can go on and on". Dr. Guldseth listened carefully to all the injuries Plaintiff
10  brought up, and he said, "The only thing I can prescribe you is Cymbalta and Ibuprofen." Cymbalta is
11  a psychotropic medication, which Plaintiff told Dr. Guldseth he have tried both in the past and
12  it didn't work. He didn't care because he prescribed it again anyway— his way of showing that
13  he changed the course of treatment. But the course of treatment Dr. Guldseth put Plaintiff on
14  by prescribing Cymbalta and Ibuprofen had been identified years ago that it did not work.
15  "Can I get an egg-crate mattress, see the pain specialist and orthopedist?" Plaintiff asked Dr. Guldseth
16  as Plaintiff's medical documents from exhibit 2 was presented to Dr. Guldseth to see. "Please take a
17  look at U.C. Davis hospital 5-12-2018 findings on your computer," Plaintiff asked Dr. Guldseth. "If
18  it's possible, can I get steroid injection to my spine." Dr. Guldseth turned his head to the left and
19  looked at Plaintiff, "I can't write an order for the stuffs you asked for because it's not
20  medically indicated," Dr. Guldseth said as he shook his head lightly from left to right in a "no
21  gesture." Plaintiff hear this word "not medically indicated" so many times from so many Defendant medical
22  doctors at RJD that it becomes business as usual. "Sooner or later this ineffective course of medical
23  treatment so many doctors have me on will cause me to die if my neck is broke when I fall
24  or paralyze," Plaintiff said to Dr. Guldseth. He didn't respond back.

25      22.       For years Plaintiff have a prescription of lisinopril to treat his
26  hypercholesterolemia, and for years he have a prescription of Calcium carbonate-D3 Vitamin D to
27  treat his osteopenia, and for years he have a prescription of Testosterone cypionate to treat his
28  hypogonadism all taking away and discontinued by Dr. Lun for no reason other than to do

18

1 cause him serious harm—even death. Dr. Luu discontinued these vital medications when
2 blood soon thereafter showed dangerous level of abnormality, which he deliberately refuses to
3 give back the medications is an act of actual malice and deliberate indifference to Plaintiff's
4 serious medical needs; and chosen th conscious disregard of an excessive risk to Plaintiff's health.

5     23.      Plaintiff have also written a handful of letters to Defendant RJD Marcus
6 POLLARD, warden; Defendant Ralph M. DIAZ, secretary of CDCR; Defendant Kathleen ALLISON,
7 secretary of CDCR; Defendant RJD Raquel BUCKEL, chief deputy warden; Defendant RJD Raymund
8 MADDEN, warden; Defendant Tammy FOSS, Director Corrections Services of CDCR; Defendant Connie
9 GIPSON, Director Division of Adult Institutions —complaining of Defendant medical doctors and its
10 administrative supervisors in the Health Care Department acting with deliberate indifference to
11 Plaintiff's serious medical needs which resulted in further significant injury and caused unnecessary
12 and wanton infliction of pain that has no penological benefits whatsoever. (See Ex. 15) Defendants
13 are acting within the scope of their employment, which Plaintiff made sure to informed them several times,
14 yet they know for a fact Plaintiff is in need of immediate medical care, but they deliberately failed to
15 take reasonable action to summon such medical care, wherefore, Defendants purposefully allowed the
16 violations to continue.

17     24.      Under color of law, Defendants ALLISON, DIAZ, MADDEN, GIPSON, FOSS,
18 S. GATES, POLLARD, BUCKEL and Matthew PALMER are bosses of bosses of prison and/or
19 CDCR, whom are the ultimate authority responsible for Plaintiff safe custody. Here Defendants
20 exposed Plaintiff to dangerous level of deliberate indifference to his serious medical needs, resulting
21 in Plaintiff suffering in severe pain and injuries — as Defendants had punitive intent to let it
22 happened when they had the sole authority to put it to a stop. Plaintiff as a prisoner must
23 depend on prison officials here named Defendants to provide him adequate medical care, due to
24 the fact Plaintiff can't just walk out of prison and go to a hospital or doctor that will
25 provide him adequate medical care. Defendants' duty is owed to Plaintiff "safe custody,"
26 whereupon, a breach of that duty owed by the Defendants to Plaintiff, a breach of that duty
27 by Defendants, that the breach was the proximate cause of harm suffered, and the damages
28 suffered were a direct result of that harm.

25. Defendant RJD Mary Ann GLYNN, Chief Executive Officer of the Health Care Department at Richard J. Donovan Correctional Facility (RJDcF) have been informed numerous time that a handful of Defendant medical doctors who acted with deliberate indifference to Plaintiff's serious medical needs which resulted in further significant injury and caused unnecessary and wanton infliction of pain. Ms. Glynn personally involved herself in violating Plaintiff's right to adequate medical care by her authority under color of state law deliberately instituted a toxic environment of [d]irecting medical doctors under her leadership to practiced deliberate indifference to Plaintiff's serious medical needs.

26. The Administration who consist of four Defendant members: Steven ROBERTS, Chief Medical Executive at RJD; John HODGES, Chief Physician Executive & Surgeon at RJD; Ryan BARENCHI, Chief Physician Executive & Surgeon at RJD and Ms. Glynn illegally in violation of the U.S. Constitution implemented substandard medical care on purpose in conscious disregard of an excessive risk to Plaintiff's health.

27. Defendants Glynn, Roberts, Hodges, Barenchi, Luu, Chau, Corleone, Silva, Amir MOHAMED, Eric P. HOFMEISTER, Brown, Waters, Casian, Laufik, Santos Euldseth, Pasha, Pollard, Eates, Diaz, Allison, Palmer, Howard TUNG, Jason MARTINEZ, Buckel, Madden, Foss, Gibson, Sedighi and Schultz illegally subjected Plaintiff to cruel and unusual punishment due to the fact they restrained Plaintiff's liberty that it renders him unable to care for himself, and at the same time failed to provide his basic human needs — medical care. Plaintiff as a prisoner must depend on Defendants for adequate medical care, which in this matter Defendants' failured to provide for his basic human needs were the result of a responsible prison officials and medical doctors' deliberate indifference to his serious medical conditions.

28. Plaintiff condition was objectively serious, and Defendants acted with the requisite state of mind, deliberate indifference to Plaintiff's serious medical needs, which their failured to treat resulted in further significant injury and unnecessary and wanton infliction of pain.

29. Defendants are well aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, which the Defendants elected to act

1   with reckless disregard toward the serious need by inaction and woefully inadequate action.

2         30.     Defendants named in ¶27 also violated Plaintiff's due process right to

3   adequate medical care.

4         31.     Defendants further violated Plaintiff's due process right to be free

5   from cruel and unusual punishment as stated in this Complaint.

6         32.     Defendants are very conscious as they each individually in their own

7   elected to violate Plaintiff's due process rights, which causes serious deliberate indifference to

8   Plaintiff's serious medical needs which resulted in further significant injury and unnecessary and

9   wanton infliction of pain stated in this Complaint.

10         33.     Dr. Hofmeister deliberately engaged in departure from good and accepted

11   medical practice when he tells Plaintiff, "If the steroid injection failed, we can do a surgery next."

12   This is the first injection, only after the 3rd or 6th injections is surgery consider.

13         34.     Since approximately 1972, the prevailing opinion has been that of McKenzie

14   who suggested that corticosteroid injection was the first line of treatment and surgery should be

15   reserved for unsuccessful injection.

16         35.     Breached of his duty as a doctor of orthopedic hand surgeon, Dr.

17   Hofmeister who's under contract with CDCR purposefully deviated from standard of care by wanting

18   to use Plaintiff as a piggy-bank so he can make more money doing a surgery than another cortico-

19   steroid injection.

20         36.     It is only such indifference that Dr. Hofmeister committed is a direct

21   offend toward evolving standards of decency in violation of the law.

22         37.     Dr. Tung neurosurgeon committed medical malpractice by heavily redacted

23   report in collusion with Defendant radiologists and medical doctors who acted with deliberate

24   indifference to Plaintiff's serious medical needs, which resulted in further significant injury and caused

25   unnecessary and wanton infliction of pain and sufferings.

26         38.     Dr. Tung tells Plaintiff that all he have is spondylosis, and therefore, don't

27   require evasive procedure.

28         39.     As stated in ¶24, Defendants' breach of contract to provide Plaintiff

1  "safe custody," that the breach was the proximate cause of harm suffered, and the damages

2  suffered were a direct result of that harm.

3          40.        Defendants named in ¶27 breached their contract when they deliberately

4  failed to provide Plaintiff adequate medical care, which they standby and allowed Plaintiff to suffered

5  further injuries, pain and sufferings.

6  D. Request for emergency Preliminary Injunction

7          41.        Plaintiff respectfully ask this Court to order Defendants to provide

8  Plaintiff the following: (1) Morphine 60mg 4x/day for 365-day, (2) Physical therapy twice a week for two

9  years, (3) CT-scan and MRI of Plaintiff's full spine, (4) Steroid injection into Plaintiff's lumbar spine once

10  a month for 3-month, (5) In-person consultation with an orthopedist, pain management specialist and an

11  endocrinologist, (6) An egg-crate mattress, (7) A "no full duty chrono" and (8) A high medical risk classifi-

12  cation.

13  E. Memorandum of Points and Authorities in Support of SAC

14          42.        Defendant medical doctors' refusal to follow advice of U.C. Davis hospital

15  who was treating Plaintiff amounts to deliberate indifference. Jones v. Simek, 193 F.3d 485, 491 (7th

16  Cir. 1999). Defendants continued to choose a course of medical treatment that was not [working]

17  disregarding the excessive risk of health to Plaintiff aggregates to deliberate indifference. Snow v.

18  McDaniel, 681 F.3d 978, 988 (9th Cir. 2012). Defendants keeps on prescribing medications in the past

19  that has been noted to be ineffective to Plaintiff's chronic severe pain problems, is a treatment

20  that is so cursory as to amount to no treatment at all, violates the U.S. Constitution. McElligott v.

21  Foley, 182 F.3d 1248, 1257. When doctors knew the extent of Plaintiff's chronic severe pain, knew

22  that the course of medical treatment was largely ineffective, and declined to do anything more to

23  attempt to improve Plaintiff's condition is deliberate indifference. Pulany v. Carnahan, 132 F.3d 1234,

24  1240 (8th Cir. 1997). Defendant medical doctors failured to treat Plaintiff's chronic severe pain

25  problem constituted deliberate indifference, due to the fact the severe pain was affecting Plaintiff's

26  daily activities (walking, standing, sitting, sleeping, etc.). McGuckin v. Smith, 974 F.2d 1050, 1060 (9th

27  Cir. 1992). Dr. Luu discontinuing Plaintiff's medications not on medical reason but to let Plaintiff

28  suffered and risk of death is deliberate indifference—denying medical care in order to punish.

1  Archer v. Dutcher, 733 F.2d 14, 17 (2nd Cir. 1984); Flowers v. Bennett, 123 F.Supp.2d 595, 600

2  (N.D. Ala. 2000). Doctors' delaying to treat severe pain effectively according to the law is deliberate

3  indifference. Lewis v. Wallenstein, 769 F.2d 1173, 1183 (7th Cir. 1985). Defendants' obdurate refusal

4  to change Plaintiff's treatment despite his reports that his medications and the course of medical

5  treatment is not working — where Plaintiff's back keeps on giving out, condition worsening, is deliberate

6  indifference. Greeno v. Daley, 414 F.3d 645, 654 (7th Cir. 2005).

7  43.          When Defendant medical doctors purposefully allowed Plaintiff to suffered

8  in severe pain by prescribing medications that does not work, is the same as his severe pain going

9  untreated is deliberate indifference. Hayes v. Snyder, 546 F.3d 516, 523 (7th Cir. 2008); Johnson-El v.

10  Schoemehl, 878 F.2d 1043, 1055 (8th Cir. 1989); Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir. 1988);

11  Kikumura v. Osagie, 461 F.3d 1269, 1291, 1296 (10th Cir. 2006). Several times Defendants refused to follow

12  specialist recommendations from U.C. Davis hospital resulted into deliberate indifference. Vereen v. Elyea,

13  113 F.Supp.2d 1211, 1215 (N.D. Ill. 2000). Doctors relentlessly left Plaintiff on a cursory pain medication

14  which they knew was not working to relief Plaintiff's chronic severe pain problems, is therefore, a

15  course of medical treatment that was a failured at best. White v. Napoleon, 897 F.2d 103, 109 (3rd

16  Cir. 1990). Plaintiff's severe pain and multiple back problems disturbed significantly — and one of them

17  is the deprivation of life necessity, which is sleep. Hangers v. Showers, 174 F.3d 716, 720 (5th Cir.

18  1999); Antonelli v. Sheahan, 81 F.3d 1422, 1433 (7th Cir. 1996). Evidence showed Defendants refuses to

19  many times to give him Morphine to relief his severe pain, as well as refusing to give him an egg-

20  crate mattress to lessen the pain on his back and help him sleep comfortably. Condition that affect

21  Plaintiff's daily activities is actionable in 1983. Kenney v. Hawaii, 109 F.Supp.2d 1271, 1279 (D. Haw. 2000);

22  Estelle v. Gamble, 429 U.S. 97 (1976); Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003). Courts have

23  ruled the lack of treatment that worsens a serious medical problem, constitutes imminent danger.

24  Brown v. Johnson, 387 F.3d 1344, 1350 (11th Cir. 2004).

25  F. Cause of Action

26  42 U.S.C. §1983, 8th Amendment to U.S. Constitution

27  (Plaintiff v. GLYNN, et al.)

28  44.          The allegations contained in this SAC, inclusive, are hereby incorporated by

23

1   reference.

2   45.   Defendants named in ¶27 violated Plaintiff's right to be free from cruel

3   and unusual punishment guaranteed to Plaintiff by the Eighth Amendment to the United States Consti-

4   tution by Defendants illegally subjected Plaintiff to woefully inadequate medical care, brought upon by

5   Defendants medical doctors deliberate indifference to his serious medical needs.

6   46.   Defendants named in ¶¶24 and 25 violated Plaintiff's right to be free

7   from cruel and unusual punishment guaranteed to Plaintiff by the Eighth Amendment to the U.S.

8   Constitution by Defendants failured to adequately supervise Defendant medical doctors that are

9   subordinate to them.

10   47.   Defendants' wrongful actions alleged herein are in violation of 42 U.S.C.

11   §1983 because they have deprived Plaintiff of rights, benefits, and privileges secured by the United

12   States Constitution.

13   48.   Defendants acted under color of state law.

14   49.   Defendants named in ¶27 knew or should have known that their conduct,

15   attitudes and actions created an unreasonable risk of serious harm to Plaintiff.

16   50.   The actions and conduct of Defendants named in ¶27 demonstrate

17   deliberate indifference to Plaintiff's Eighth Amendment rights.

18   51.   As a proximate result of the Defendants' violations of Plaintiff's right

19   to be free from cruel and unusual punishment while he was at RJD, Plaintiff has suffered, is

20   suffering, and will continue to suffer irreparable harm.

21   52.   As a direct and foreseeable result of the Defendants' violations of the

22   Eighth Amendment, Plaintiff has suffered, is suffering and will continue to suffer physical

23   injuries in the form of damage to his back, hand, knee, head, hypogonadism, hypercholesterolemia,

24   problems with balance and other injuries.

25   53.   As a direct and foreseeable result of the Defendants' violations of

26   the Eighth Amendment, Plaintiff has suffered, is suffering and will continue to suffer injuries

27   in the form of pain and suffering, shame, humiliation, degradion, emotional distress, embarrassment,

28   mental distress and other injuries.

54.     An actual controversy exists between Plaintiff and Defendants concerning their rights, privileges, and obligations.

55.     Defendants named in ¶27 acts were willful, intentional, malicious, wanton, and despicable in conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of exemplary damages.

## PRAYER FOR RELIEF

56.     WHEREFORE, Plaintiff respectfully prays for relief as follows:

1. Issue a declaratory judgment that the Defendants' actions complained of herein violate Plaintiff's rights under the U.S. Constitution and as otherwise alleged herein;

2. Award Plaintiff monetary damages, compensatory, punitive, actual, consequential, continuing, criminal, direct, accumulative, general, inadequate, irreparable, necessary, pecuniary, presumptive, prospective, proximate, rescissory, speculative, substantial, vindictive, and special damages from future medical expenses— the total of these twenty-two different damages in an amount of six million dollars ($6,000,000.00);

3. Award Plaintiff the costs of suit and reasonable attorneys fees;

4. Grant Plaintiff request for emergency Preliminary Injunction; and

5. Grant Plaintiff such other and further relief as the Court deems just and proper.

Dated: May 22, 2022

Respectfully submitted,

Hung Duong Nguyen
In Pro Se

25

Hung Duong Nguon
K-49649, C-13-238
480 Alta Road
San Diego, CA 92179
RJD Correctional Facility

PRIORITY MAIL
$00.70

United States District Court
Southern District of California
Office of the Clerk
333 West Broadway, Suite 420
San Diego, CA 92101

RECEIVED
MAY 24 2022
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CA

Confidential
Legal Mail

